UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                   Case No. 07-C-715

NORTHEAST COMMUNICATIONS OF
WISCONSIN, INC.,

        Defendant.

**DECISION AND ORDER**

The United States brought this action under 47 U.S.C. § 504 to enforce a $75,000 forfeiture imposed by the Federal Communications Commission against Defendant Northeast Communications of Wisconsin, Inc. ("Northeast"). The FCC imposed the fine as a result of Northeast's communication with a bidder in a 2002 auction for licenses in the 698-746 MHz band of the electromagnetic spectrum. The FCC found that the communication between a Northeast representative and a bidder for another applicant, Star Wireless, LLC ("Star") violated the anti-collusion rule found at 47 C.F.R. § 1.2105(c)(1). Both sides have moved for summary judgment on the basis of the stipulated facts found in the administrative record. For the reasons given herein, the Plaintiff's motion will be granted and the Defendant's denied.

**I. BACKGROUND AND STATUTORY FRAMEWORK**

As noted, the facts have been stipulated, and these facts are not extensive. On May 8, 2002, Northeast filed an application to participate in Auction No. 44, an auction for licences in the

wireless spectrum. Another company, Star Wireless, LLC, had also filed such an application. In addition to requiring an application, the applicable auction regulations require that an applicant make an upfront payment in order to be able to participate in the auction. "If the applicant does not submit at least the minimum upfront payment, it will be ineligible to bid. Its application will be dismissed and any upfront payment it has made will be returned." 47 C.F.R. § 1.2106(c). Star Wireless made an upfront payment, and thus it was an applicant qualified to bid. Defendant Northeast, however, did not make an upfront payment, and accordingly by the time of the auction it was ineligible to be a qualified bidder.

The regulation's anti-collusion rule is found at 47 C.F.R. § 1.2105(c)(1):

(c) Prohibition of collusion.
(1) Except as provided in paragraphs (c)(2), (c)(3), and (c)(4) of this section, after the short-form application filing deadline, all applicants for licenses in any of the same geographic license areas are prohibited from cooperating or collaborating with respect to, discussing with each other, or disclosing to each other in any manner the substance of their own, or each other's, or any other competing applicants' bids or bidding strategies, or discussing or negotiating settlement agreements, until after the down payment deadline, unless such applicants are members of a bidding consortium or other joint bidding arrangement identified on the bidder's short-form application pursuant to § 1.2105(a)(2)(viii).

Star's authorized bidder was David Behenna, and Northeast's application listed Patrick Riordan as its authorized bidder. David Behenna began bidding for licenses on August 28, 2002. The same day, Behenna left a voicemail message for Riordan, instructing Riordan to call him back if Northeast was not participating in the auction. As counsel for Star later explained, the condition that Riordan should only return the call if he was not participating in the auction was apparently meant to ensure that the two did not run afoul of the FCC's anti-collusion rule – if Northeast was not involved in the auction, they believed, they would not be colluding if they talked to each other. Indeed, Northeast was ineligible to bid in the auction (recall that it had not paid the upfront fee), and

2

thus Riordan returned Behenna's call the next day. In a brief telephone conversation, Riordan informed Behenna that Northeast was interested in several Wisconsin markets at stake in the auction, and soon after the call Star began bidding on those markets. Because these markets were in areas that Star otherwise had no interest, presumably (and it is not denied) Star was bidding on Northeast's behalf.

Both Star and Northeast reported the conversation to the FCC, pursuant to the regulation's requirement that applicants self-report violations of the anti-collusion rule. 47 C.F.R. § 1.2105(c)(6). The FCC imposed a Notice of Apparent Liability for both companies and proposed $100,000 fines for each. The FCC subsequently issued forfeiture notices, finding that both companies had engaged in "collusive conduct during a Commission-conducted auction in 2002, in willful and repeated violation of section 1.2105(c)." 19 FCCR 18,635 (2004). On May 4, 2007, the Commission denied the request for review by both companies, although it reduced the forfeiture to $75,000 in light of both companies' past history of compliance. Star petitioned for review of the Commission's decision in the D.C. Circuit Court of Appeals, and that court recently affirmed the Commission's decision. Northeast did not join in that appeal, but the action brought in this Court by the United States raises several issues that mirror those raised in the D.C. Circuit proceeding.

**II. ANALYSIS**

Northeast brings several challenges to the FCC's imposition of the forfeiture. The first two challenges posit that Northeast's communication with Star did not violate the letter of the anti-collusion rule. Northeast also argues that the rule itself is impermissibly vague and that the rule, as interpreted by FCC staff, is unconstitutional. It raises a number of other arguments based on

3

vagueness, and it further argues that the forfeiture is arbitrary and capricious because Northeast did not engage in "willful" or "repeated" violations of the rule. I address each of these arguments below.

### A. Subject Matter Jurisdiction

On May 14, I directed the parties to submit supplemental briefs addressing the question of this Court's subject matter jurisdiction over certain of Northeast's defenses. Both sides have now stated their positions with respect to the jurisdictional question, and I conclude that this Court does have jurisdiction to consider the Defendant's various challenges to the FCC's rules.

The May 14 order outlines the jurisdictional issues involved. In short, based largely on an Eighth Circuit case, *United States v. Any and all Radio Station Transmission Equipment,* 207 F.3d 458, 463 (8th Cir. 2000) (*"Fried III"*), I concluded that there was some question as to whether a district court could entertain facial challenges to the FCC's rules without treading on the statute that provides for exclusive jurisdiction in the court of appeals. In particular, 28 U.S.C. § 2342 provides in part that "[t]he court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend . . . or to determine the validity of-(1) all final orders of the [FCC] made reviewable by § 402(a) of title 47."

Although the Eighth Circuit case and an unpublished case from Oregon have suggested that a district court lacks jurisdiction to consider constitutional and other challenges to the FCC's rules, there is no controlling authority holding that a defendant in a § 504 forfeiture action may not raise such challenges. *See United States v. TravelCenters of America,* 2007 WL 2994594, at *3 (D. Or. 2000). *Fried III* was an *in rem* forfeiture action brought under § 510, rather than § 504, and that

4

distinction is important.[1] The importance arises because § 504 (unlike § 510) grants *exclusive* jurisdiction to the district courts to hear challenges, *de novo*, to unpaid forfeiture orders. 47 U.S.C. § 504(a); *AT&T Corp. v. FCC,* 323 F.3d 1081, 1084 (D.C. Cir. 2003) ("section 504 of the Communications Act of 1934 vests exclusive jurisdiction in the district courts to review, in the first instance, licensee challenges to forfeiture orders.") (quoting *Pleasant Broadcasting Co. v. FCC,* 564 F.2d 496, 497 (D.C. Cir. 1977)).

Although *AT&T* does not provide an explicit answer, it is clear that forfeiture subjects in Northeast's shoes have the option of paying the fine (as Star Wireless did) and heading to the court of appeals for review, *or* refusing to pay and waiting for the government to bring a § 504 forfeiture action in district court:

> allowing forfeiture subjects to choose between challenging unpaid forfeiture orders in district court and challenging paid forfeiture orders in the court of appeals means that they can control the forum of review by deciding whether or not to pay the penalty. The obvious answer to this concern is section 504(a)'s plain language: By limiting district court jurisdiction to unpaid forfeitures, it gives forfeiture subjects that very choice. Such forum-controlling compliance choices, moreover, are common in statutes providing for judicial review of regulatory decisions.

*Id.* at 1085. What is implied is that a forfeiture subject's forum-controlling choice is an *equal* choice in terms of the kinds of defenses and challenges the forfeiture subject might lodge. In other words, absent from *AT&T* or any other case is the notion that a district court forfeiture action under § 504 is to be viewed as a poor relation to a challenge brought in the court of appeals. More importantly, the fact that district courts have exclusive jurisdiction over *unpaid* forfeitures like

---

[1] 47 U.S.C. § 510(b) provides that "[a]ny property subject to forfeiture to the United States under this section may be seized by the Attorney General of the United States upon process issued pursuant to the supplemental rules for certain admiralty and maritime claims by any district court of the United States having jurisdiction over the property. . ."

Northeast's means that there is no danger of treading on the appellate courts' exclusive jurisdiction under § 402(a) because the appellate courts have no jurisdiction to hear such actions. There is, in other words, no conflict. Ultimately, there seems little reason to conclude that the only way a forfeiture subject can raise certain defenses to a forfeiture is by paying it and proceeding to the court of appeals. Without any controlling authority to the contrary, I conclude that this Court has jurisdiction to consider all of Northeast's defenses.

### B. Violation of the Anti-Collusion Rule

Northeast's first two challenges assert that its actions did not violate the anti-collusion rule. As outlined earlier, that rule provides, in relevant part:

> after the short-form application filing deadline, all applicants for licenses in any of the same geographic license areas are prohibited from cooperating or collaborating with respect to, discussing with each other, or disclosing to each other in any manner the substance of their own, or each other's, or any other competing applicants' bids or bidding strategies . . .

47 C.F.R. § 1.2105(c)(1).

Northeast's first argument focuses largely on the second-half of the rule's text. It argues that in communicating to Star its interest in certain Wisconsin licenses, it was not communicating any "bids or bidding strategies." *Id*. At worst, it believes, the communication had only a tangential impact on any bids or bidding strategies, and that is not what the rule proscribes.

Yet the rule seems quite clear on the point. It prohibits any applicant from "cooperating or collaborating with respect to, discussing with each other, or disclosing to each other *in any manner* . . . each other's . . . bids or bidding strategies." Both Star and Northeast were applicants (see *infra*), and Northeast "cooperated or collaborated with respect to" Star's ("each other's") bidding strategy by informing Star – an active bidder – what licenses it desired to obtain during the bidding process. The fact that Star immediately commenced bidding for those licenses is indisputable

6

evidence of such cooperation or collaboration. It is difficult to envision how the FCC erred in so concluding. Indeed, the very fact that Behenna's voicemail request that Riordan call him back was contingent upon Northeast not participating in the auction suggests an understanding that the conversation Behenna was proposing would otherwise have run afoul of the FCC's anti-collusion rule.

The more salient objection to the forfeiture is Northeast's objection that it was not an "applicant" at the time of the communication. Although Northeast had filled out and filed the original application to bid at the auction, it had failed to pay the required upfront fee, and the fee was a mandatory precondition to Northeast's ability to participate in the auction. At the time of its communication with Star, Northeast was ineligible to bid at the auction, which means it cannot possibly have violated the rule: how could it "collude," it asks, with respect to an auction in which it was not even eligible to participate?

Although Northeast makes a fair point, its analysis really only proposes an alternative interpretation of the rule – it does not support the argument that the rule has been misinterpreted or misapplied. By its plain terms, the rule applies to "applicants." Northeast's position is that the rule really means "*live* applicants" – i.e., those applicants who also paid the fee to qualify as bidders eligible to bid at the auction, as opposed to those who have applied but failed to pay the required upfront fee. The D.C. Circuit has noted that there may be "plausible alternative interpretations of the anti-collusion rule," but the rule itself applies to applicants regardless of whether their applications may have lapsed due to failure to pay the upfront fee. *Star Wireless, LLC v. F.C.C.,* 522 F.3d 469, 474 (D.C. Cir. 2008). In the abstract, it is hardly a stretch for the agency to consider an "applicant" as "someone who has applied" – the plainest meaning of the term – just as one might be deemed an applicant for a job or driver's license even if one failed to provide all the required

7

information. Here, the rule's plain language specifically applies to "*all* applicants for licenses in any of the same geographic license areas" – suggesting an arguably broader meaning of the term. Adding a limitation to the "all applicants" language would improperly interpolate an important condition into the regulation where none exists. In sum, it is difficult to conclude that the FCC erred in concluding that "applicants" means anyone who has filed an application for a license.

### C. Vagueness and Staff Interpretations

Next, Northeast argues that the forfeiture was unfair because the multiple possible interpretations of the rule rendered the rule vague and unenforceable.[2] Because of this vagueness, Northeast asserts it lacked sufficient notice that its activities would be considered a violation of the rule.

Before a forfeiture may be assessed, an agency must provide forfeiture subjects with "adequate notice of the substance of the rule." *PMD Produce Brokerage Corp. v. USDA,* 234 F.3d 48, 52 (D.C. Cir. 2000). Whether that has occurred involves not just the text of the regulation itself, but any other public statements made by the agency. The question is whether "a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform." *Star Wireless,* 522 F.3d at 473 (quoting *Trinity Broad. of Fla., Inc. v. FCC,* 211 F.3d 618, 628 (D.C. Cir. 2000)).

Northeast cites a panoply of agency utterances suggesting the agency itself was flailing about with no consistent or clear interpretation of its own rules. Northeast also suggests that the particular circumstances of Auction No. 44 itself rendered the rule vague. While Auction 44 was in the works, Congress passed the Auction Reform Act, which required the FCC to delay the auction. Because

---

[2]This is generally argued by Northeast in arguments numbered 3, 5 and 6 of its brief.

8

the auction had been delayed after applications had already been filed, the FCC took the unusual step of allowing applicants to withdraw from the auction and receive refunds (if they had paid upfront fees). Northeast argues that the FCC's communications with auction participants during this period was confusing and led to misunderstandings about the continuing anti-collusion duties of non-bidding applicants.

Northeast highlights several instances in which the FCC referred to "bidders" rather than applicants. In particular, the FCC's June 26 Notice stated: "[a]ny qualified bidders departing from Auction No. 44 remain subject to the Commission's anti-collusion rule until the post-auction down payment deadline." Auction No. 44 Revised Schedule, License Inventory and Procedures 17 FCCR 11935, 11938 (2002). Northeast further notes that the FCC allowed applicants an early departure for Auction No. 44, and those who elected to do so would get refunds of any upfront payments and would no longer be eligible to bid in the auction. Because applicants for Auction No. 44 could choose to depart from the auction process and get a refund, that suggests their ability to "collude" was at an end.

This argument traces Northeast's more general position that ineligible applicants cannot possibly engage in collusion. The problem is that the anti-collusion rule is a broad one, and its applicability was made quite clear by the agency. In the August 7 notice (issued three weeks before the telephone communication between Behenna and Riordan), the agency informed applicants in no uncertain terms that the anti-collusion rules would apply even if they chose to drop out of the auction:

> Prohibition of Collusion. All parties that submitted short-form applications to participate in Auction No. 44, including but not limited to qualified bidders (regardless of whether they elected to depart from the auction) are reminded that they remain subject to the Commission's anti-collusion rule until the post-auction down payment deadline.

9

In re Auction No. 44 Revised Qualified Bidder Notification 125 Qualified Bidders, 17 FCCR 15543, 15549 (August 7, 2002). Given this clear statement of applicability, it is difficult to perceive how an applicant would reasonably be confused by the particular circumstances of Auction No. 44.

Northeast also suggests that the FCC's continued references to "bidders," rather than applicants, resulted in the FCC sending mixed signals. Because the FCC's notice stated that "qualified bidders" (as opposed to just applicants) who departed were still subject to the anti-collusion rule, the implication was that those who were never qualified bidders in the first place were *not* subject to that rule.

Although these interpretations are not outlandish, Northeast's arguments rely on a selective and deliberate search for ambiguity rather than any real and demonstrable mixed messages from the FCC. First of all, the language Northeast cites does not leave the impression that the FCC was somehow intending to exempt applicants who had failed to become qualified bidders; nor does it suggest that it was equating "bidders" with "applicants." At worst the language informs a more narrow class of applicants (those who had become qualified bidders) that they were still subject to the anti-collusion rule. Such statements would not justify other applicants from believing their own anti-collusion obligations had ceased. The numerous citations Northeast offers regarding the duties of "bidders" is only meaningful when one takes the unwarranted step of inferring that the term means "bidders (and *only* bidders)."

What makes Northeast's interpretation even less reasonable is that the first page of the very same June 26 Notice provides: "All parties that submitted short-form applications to participate in Auction No. 44, *including but not limited to qualified bidders*, are reminded that they remain subject to the Commission's anti-collusion rule until the post-auction down payment deadline." Auction No. 44 Revised Schedule, License Inventory and Procedures, 17 FCCR 11935, 11936 (2002) (italics

10

added). And, as noted above, this advice was repeated in the FCC's August 7 Notice, and that notice went so far as to inform applicants that they were still subject to the anti-collusion rule *even if they dropped out* of the auction entirely. 17 FCCR at 15549. These statements were unambiguous and were issued well in advance of the auction. To the extent there could have been any misunderstandings based on the FCC's discussion of the obligations of "bidders," they should have been clarified by the agency's clear and repeated statements that "all parties that submitted short-form applications . . . remain subject to the Commission's anti-collusion rule." *Id.*

Finally, Northeast also briefly argues that the FCC's interpretation of the rule is based on staff "clarifications" rather than the rule itself. This is confirmed, it believes, by the fact that the pre-auction packet the FCC distributed for Auction No. 58 – which occurred after the auction at issue here – contained an even clearer warning to applicants than the warnings contained in previous notices. In boldface print, the FCC's notice for Auction No. 58 stated that the anti-collusion rule applies to all applicants regardless of whether they become qualified bidders or not. Auction of 700 MHz Band Licenses Scheduled for January 24, 2008*,* 22 FCCR 18,141, 18,149 (2007). Even so, a subsequent clarification does not mean that any earlier statements – which were largely to the same effect – were necessarily unclear. As set forth above, the notices for Auction No. 44 state quite clearly that the anti-collusion rule is triggered by filing the application rather than paying the fee. And, as the D.C. Circuit found, "[w]e note that the Commission has clarified its instructions with regard to the anti-collusion rule . . . but this change does not mean that its previous warnings were not sufficient to put the regulated community on notice concerning the scope of the rule." 522 F.3d at 475. Additionally, as the D.C. Circuit further noted, to the extent the rule's meaning is based on staff interpretation, "*Robert Pettit* [on which the interpretation was based] was an official

11

interpretation issued by the Commission's staff under delegated authority, which has 'the same force and effect ... [as] other actions of the Commission.' 47 U.S.C. § 155(c)(3)." *Id.* at 473. In sum, the rule was not the product of *ultra vires* staff interpretations, and neither the FCC's prior statements nor the unique circumstances of Auction No. 44 rendered the rule impermissibly vague or unenforceable.

### D. The Interpretation is not Arbitrary or Capricious

Northeast also briefly argues that the FCC's interpretation of the rule is capricious because it penalizes Northeast for a non-existent problem. Because Northeast was a "mere disqualified bidder" at the time of the auction, the penalized communication at issue (it believes) could not have resulted in any diminished competition. (Def. Br. at 21.) As such, in Northeast's view the FCC's interpretation of the rule attacks a problem that does not even exist.

This argument echos Northeast's more general position that the FCC's enforcement action in this case was wasteful and unnecessary. The limited nature of the communication, the fact that Northeast was not a qualified bidder, and the fact that both sides self-reported the infraction suggest that the FCC's action was arguably heavy-handed. Though the Court is not without sympathy for Northeast's position, especially since Northeast self-reported the contact, it is unable to characterize the agency's action here as "capricious." Even though Northeast was ineligible to bid, it is undeniable that its communication had a direct impact on the auction itself. When an interested party effectively bids secretly through an agent, the other bidders remain unaware of both the actual bidder's identity as well as the fact that there is more interest in a given license than meets the eye. That is not to say there was a demonstrable effect here, but it is far from capricious for the FCC to desire as much transparency in the bidding process as is possible. (*See infra.*)

12

### E. The Rule is not Unconstitutional

Northeast further argues that if the FCC's interpretation of the rule stands, the rule would be an unconstitutional restriction on free speech. Under *Hudson Gas and Electric Corp. v. Public Service Commission of New York,* commercial speech may be restricted if the government shows that (1) it has a substantial interest in regulating the speech; (2) the restriction directly advances that interest; and (3) the interest would not be served as well by more limited restrictions. 447 U.S. 557, 564 (1980). Ultimately, the government must demonstrate

> a 'fit' between the legislature's ends and the means chosen to accomplish those ends--a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served; that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, a means narrowly tailored to achieve the desired objective.'

*Board of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480 (1989) (citations omitted).

Northeast's constitutional challenge fails for the reasons noted above. The fact that the regulation applies to auction applicants who are unable to bid does not mean the rule does not "fit" the FCC's goals (the legitimacy of which Northeast concedes). As the government notes, transparency is the overwhelming concern underlying the rules. The point is that if a market for a license exists, the FCC prefers that the identities of those interested in the license be made clear rather than opaque. Bids are to be made openly rather than through undisclosed arrangements. Although bidders may make bidding arrangements between themselves, these must be publicly disclosed in advance *on the application*:

> The short-form application must contain the following information:
> . . .
> (viii) An exhibit, certified as truthful under penalty of perjury, identifying all parties with whom the applicant has entered into partnerships, joint ventures, consortia or other agreements, arrangements or understandings of any kind relating to the

13

licenses being auctioned, including any such agreements relating to the post-auction market structure.

47 C.F.R. § 1.2105(a)(2)(viii).

It is thus evident that the FCC has an interest in learning the identities of anyone bidding at auction as well as anyone with whom the "applicants" (not just "bidders") have any sort of arrangement involving the licenses being auctioned. The government's interest in openness is a legitimate goal that is achieved partly through the anti-collusion rule, even when that rule is applied to non-bidders.

Northeast argues that these concerns are unpersuasive because an entity could have a secret bidding arrangement without applying for a license at all. In that event, the secret entity would not violate the rule (because it hadn't even *applied* for the auction) but would still be able to achieve the very ends the FCC seeks to preclude through its anti-collusion rule. Because entities could get away with undisclosed bidding arrangements with or without the rule, Northeast argues, the rule cannot possibly "fit" the ills it seeks to cure. But Northeast's premise does not appear to be true, at least when there exists an understanding or arrangement between the parties. As set forth above, secret bidding arrangements would violate the disclosure rules because the applicant (there has to be at least *one* applicant-bidder) is required to disclose bidding arrangements. 47 C.F.R. § 1.2105(a)(2)(viii). Suppose (to use Northeast's example) Northeast had not applied for a license at all, but instead had communicated its interest in the licenses to Star while Northeast remained wholly in the background. (Def. Br. at 23 n.50.) Under this scenario, the secret arrangement it reached with Star would have to be disclosed (by Star) under 47 C.F.R. § 1.2105(a)(2)(viii) as an "arrangement or understanding[] of any kind relating to the licenses being auctioned."[3] True, it

---

[3] The rules impose a duty to update applications to reflect joint bidding arrangements entered into following the short-form application. 47 C.F.R. § 1.2105(c)(5).

might not be a violation for *Northeast*, since Northeast would not have been an applicant. But that does not mean the undisclosed communication would have been acceptable under the applicable rules – Star would have had to disclose it on its application or update its application to reflect the arrangement. As such, the rule *does* proscribe the kind of activity Northeast describes, and it thus "fits" the FCC's legitimate goals.

Moreover, even if some conduct might have been able to circumvent the scope of the rule, the mere fact that some *other* unregulated conduct might also cause competitive harm does not mean that the FCC's efforts are ineffective in combating that same harm. In other words, the fact that the rule may not penalize all anti-competitive or collusive conduct does not mean it is unfocused. In fact, Northeast's argument cuts the other way, too – by having the rule triggered only when one applies for an auction, it ensures the rule is more narrowly drawn to cover only that small group of entities that has applied to bid in a given auction and voluntarily subjected themselves to the anti-collusion rule. In sum, the government has identified several legitimate goals fostered by the anti-collusion rule, and Northeast has not persuasively argued that the rule does not "fit" the government's legitimate objectives.[4] I thus conclude that the rule, as presently interpreted, is constitutionally sound.

### F. Willful and Repeated Violations

Finally, Northeast argues the FCC got it wrong when it concluded Northeast had willfully and repeatedly violated the anti-collusion rule. To recall, there were two instances of

---

[4] Northeast makes a brief argument that the forfeiture imposed was arbitrary and capricious, as well as a violation of the Excessive Fines clause of the Eighth Amendment. (Def. Br. at 27-28.) It seems the government's position is sound, however. Northeast faulted the Commission for parroting the forfeiture order and not explaining in detail why it imposed the forfeiture it did. Title 47 U.S.C. § 503(b)(2)(D) requires the Commission to take into account the nature and circumstances of the offense, and in fact that is precisely what the Commission did when it reduced the forfeiture from $100,000 to $75,000. (Dkt #12-2, Ex. C at ¶ 23) (noting a "downward adjustment of the forfeitures is warranted" in light of the parties' past history of compliance.)

communication at issue here: the original voicemail message and then the actual substantive discussion about the licenses Northeast sought. Northeast argues that it is preposterous to penalize it for a voice message when the message merely suggested the possibility of communication rather than conveying any substantive bid information or strategy.

Although Northeast's position is quite reasonable, there is no indication that the FCC's forfeiture order was in any way based on a finding of multiple offenses. Although the order following the Notice of Apparent Liability uses the term "willful and repeated," the discussion in that decision did not suggest that the agency was finding two distinct violations of the rule. (Dkt. # 12-2, Ex. A.) More importantly, the Forfeiture Order imposed the forfeiture for "willfully violating" the Commission's rules – eliminating the reference to "repeated." (*Id.*, Ex. B, ¶ 17.) Similarly, the FCC's Order on Review gives no significance to the original voicemail. Accordingly, there is nothing in the record to suggest the penalty was in any way related to the original voicemail message or that the FCC imposed the forfeiture for repeated offenses.

Northeast also argues that the Commission's determination that Northeast acted willfully was erroneous. Its argument, however, is tantamount to suggesting that ignorance of the law is a defense. Northeast does not deny that the communication itself was willful, nor can it deny (as discussed above) that the purpose of the communication was to discuss bidding strategies. That it may have been confused about its obligations under the anti-collusion rule cannot somehow provide it a defense to liability. Northeast has provided no authority for its position that "willful" must mean one knows he is violating a given law or regulation. *Safeco Ins. Co. of America v. Burr,* 127 S.Ct. 2201, 2208 (2007) (noting that "'willfully'" is a 'word of many meanings whose construction is often dependent on the context in which it appears,'") (quoting *Bryan v. United States,* 524 U.S. 184, 191 (1998)). The *Safeco* court noted that "knowing violations are sensibly understood as a

more serious subcategory of willful ones," *id.* at 2210, yet Northeast essentially asks this court to equate "knowing" and "willful." Regardless of the proper level of deference owed the FCC, the fact that Northeast did not know its conduct was unlawful does not mean it was not willful conduct. Accordingly, I conclude the FCC did not err in imposing a forfeiture based on Northeast's willful conduct.

### III. CONCLUSION

For the reasons given above, the Plaintiff's motion for summary judgment is **GRANTED** and Northeast's motion is **DENIED**. Judgment in the amount of $75,000 is to be entered in favor of the United States.

**SO ORDERED** this   25th   day of June, 2008.

                                           s/ William C. Griesbach
                                           William C. Griesbach
                                           United States District Judge